# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF FLORIDA
# MIAMI DIVISION

### CASE NO. 09-21235-CIV-ALTONAGA/Brown

**YASSIM MOHAMED**,

      Plaintiff,

vs.

**PUBLIC HEALTH TRUST OF MIAMI-DADE COUNTY** d/b/a **JACKSON NORTH MEDICAL CENTER**,

      Defendant.

_____/

### <u>ORDER</u>

**THIS CAUSE** came before the Court upon Defendant, Public Health Trust of Miami-Dade County's ("the Trust['s]") Motion for Summary Judgment ("Motion") [ECF No. 16], filed on April 27, 2010. The Trust moves for summary judgment on Plaintiff, Yassim Mohamed's ("Mohamed['s]") claims of religious discrimination under Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. §§ 2000e(1)–(17), and the Florida Civil Rights Act ("FCRA"), Fla. Stat. §§ 760.01–.11 (2009). The Court has considered the parties' written submissions and the applicable law.

## I. BACKGROUND[1]

The present case concerns an employment termination and religious discrimination dispute. Mohamed worked for Tenet Healthcare Corporation's ("Tenet['s]") Parkway General Hospital from

---

[1] For the purposes of summary judgment, the Trust concedes to most of Mohamed's Statement of Disputed Material Facts. (*See* Reply 2 [ECF No. 21]). Facts that remain disputed are identified as such and are construed in a light most favorable to the non-movant, Mohamed.

Case No. 09-21235-CIV-ALTONAGA/Brown

April 1997 to December 16, 2006, when Tenet transferred ownership of the hospital to the Trust. (*See* Compl. ¶ 14 [ECF No. 1]; Def.'s Statement of Material Facts ("Def.'s SMF") ¶ 2 [ECF No. 17]). The new owners renamed the hospital Jackson North Medical Center ("Jackson North"), and like other former Tenet employees, Mohamed applied for and was hired on December 16, 2006 to his previous position, in his case as a clerk in the radiology department. (*See* Def.'s SMF ¶ 1; Pl.'s Statement of Disputed Material Facts ("Pl.'s SDF") ¶1 [ECF No. 20]). Shirley Harris ("Harris"), Mohamed's supervisor, and Elliot Silverman ("Silverman"), Director of Radiology and also Harris's supervisor, were retained by the Trust in the same positions they previously held with Tenet. (*See* Def.'s SMF ¶ 4; Pl.'s SDF ¶ 4). Silverman reported to William McKeon, Jr. ("McKeon"), Jackson North's Director of Operations, who reported to Sandy Sears ("Sears"), Jackson North's Chief Executive Officer ("CEO"). (*See* Def.'s SMF ¶ 6; Pl.'s SDF ¶ 6).

The employees in the Radiology Department received new job descriptions as employees of the Trust, but initially there were no substantial changes made regarding the employees' duties and responsibilities. (*See* Pl.'s SDF ¶ 4; Silverman Dep. 85:12–87:7, April 12, 2010 [ECF No. 17-5]). Mohamed's job duties did not change as a result of the transfer in ownership. (*See* Silverman Dep. 88:14–15). However, all new hires, including Mohamed, Harris and Silverman, were required to serve a six-month probationary period. (*See* Def.'s SMF ¶¶ 5–6; Pl.'s SDF ¶ 4). According to the Trust's policy, "[a] new . . . employee whose performance does not meet work standards, may be separated at any time during the probationary period." (Policy & Proc. Manual ("Manual") 1 [ECF No. 17-6]).

2

Case No. 09-21235-CIV-ALTONAGA/Brown

During his time as a Tenet employee, Mohamed – a Muslim of Indian descent – had been allowed to use accumulated vacation time to leave work an hour early on Fridays to attend Muslim religious services. (*See* Def.'s SMF ¶¶ 2–3; Pl.'s SDF ¶¶ 2–3). Within a week or two after the Trust took over Mohamed asked Harris to confirm his religious accommodation would continue under the new administration, but she rejected his request and told Mohamed he would have "to go through the same procedure to get permission to go." (Mohamed Dep. 28:4–18, 39:6–42:7, March 22, 2010 [ECF No. 17-3]). Mohamed then sought permission from Silverman, who told him to "[g]o back to [Harris]. She is your immediate supervisor." (*Id.* 43:16–44:11). He returned to Harris, who again refused permission and told Mohamed "you have to go back to Mr. Silverman." (*Id.* 45:2–46:9). Mohamed again went to Silverman, who said he could not grant the accommodation. (*See id.* 46:17–25). "You have to go back to [Harris]. It is up to [Harris]." (*Id.* 46:1–2). Mohamed did not go to Harris a third time. (*See id.* 46:3–4).

From December 16, 2006 to January 30, 2007, Mohamed was not given permission to leave work early on Fridays to attend religious services. (*See* Pl.'s SDF ¶ 7). During that period, Mohamed did not leave work early on two Fridays, January 5 and 12, 2007. (*See id.*). He did leave work early on December 22 and 29, 2006, using "Admin Leave" in recognition of the holiday season, and Mohamed left early on January 19 and 26, 2007, using personal leave. (*See id.*; Timecard 1 [ECF No. 17-7]).

On January 29 or 30, 2007, Mohamed gave a letter to Sears petitioning to continue his religious observance. (*See* Def.'s SMF ¶ 10; Pl.'s SDF ¶ 9; Mohamed Decl. ¶ 3 [ECF No. 20-1]; Letter to Sears 1 [ECF Nos. 17-8, 20-2]). The written request moved down the chain of command

3

Case No. 09-21235-CIV-ALTONAGA/Brown

from Sears to McKeon. (*See* Def.'s SMF ¶ 10; Pl.'s SDF ¶ 10). McKeon spoke with Silverman, and they agreed to grant Mohamed's request. (*See id.*). Silverman ultimately informed Mohamed his request was granted on January 30, 2007. (*See* Def.'s SMF ¶ 11; Mohamed Dep. 53:1–17; Mohamed Decl. ¶ 4).

While the timing is uncertain, McKeon told Harris of Mohamed's letter to Sears. (*See* Pl.'s SDF ¶ 9; Harris Dep. 91:1–94:12, April 21, 2010 [ECF No. 20-3]). In her deposition, Harris indicated after McKeon told her about the letter she suggested changing Mohamed's work schedule to Sunday through Thursday. (*See* Harris Dep. 97:1–98:11). However, Harris also wrote a statement on or after January 30, 2007, indicating she informed McKeon on January 22, 2007 (a week *before* McKeon was in possession of Mohamed's letter) that Mohamed's schedule would be Sunday through Thursday. (*See* Harris Dep. 95:17–96:25; *id.* at Ex. 5 ("Harris Mem.") 36). The Harris memorandum also indicates Mohamed objected on January 30, 2007 to a schedule change because he was afraid he would be fired as "he did not know the job even after training." (Harris Mem.).

Harris called Mohamed into her office after he met with Silverman on January 30, 2007. (*See* Pl.'s SDF ¶ 9; Mohamed Dep. 50:5–15; Mohamed Decl. ¶ 5). When Mohamed entered the office, Harris said, "So you went over my head. . . . This is a Christian country. If I give you time off to go to the mosque, I have to give everybody time off to go to church. We don't kill people here. Your religion is your problem. Deal with it." (Mohamed Dep. 31:9–20; 40:3–15; 50:17–51:13). Harris also said "she would transfer [Mohamed] to the front file room, and change [his] schedule." (Mohamed Decl. ¶ 5). Within a day or two of his confrontation with Harris, Mohamed's job duties and responsibilities were changed "drastically." (Mohamed Dep. 108:5; *see* Def.'s SMF ¶ 12; Pl.'s

Case No. 09-21235-CIV-ALTONAGA/Brown

SDF ¶ 12).  He was moved to the front file room from the back file room, was required to answer phones, copy and match films, and pull reports from the computer.  (*See* Pl.'s SDF ¶ 12; Mohamed Dep. 108:7–112:7).  Mohamed's schedule was also changed to Sunday to Thursday, but, according to Harris, he was terminated before it went into effect.  (*See* Harris Dep. 99:24–100:1).  On Friday, February 2, 2007, Mohamed did not leave work early.  (*See* Timecard 1; Pl.'s SDF ¶ 7).

On February 8, 2007, Silverman observed Mohamed reading a newspaper in the X-ray area of the emergency room.  (Def.'s SMF ¶ 14; Silverman Dep. 117:19–118:1).  Silverman discussed his observation with Harris, who agreed with Silverman that Mohamed should be terminated.  (*See* Silverman Dep. 117:23–24, 119:3–9, 127:9–13; *contra* Harris Dep. 101:10–24).  Silverman also called McKeon and recommended terminating Mohamed; McKeon agreed.  (*See id.* 117:24–118:1; 127:7–17; McKeon Dep.20:10–11, April 21, 2010 [ECF No. 17-2]).  Silverman, with Harris's input, prepared a letter to support Mohamed's termination, citing four observations of Mohamed by Harris and Silverman.  (*See id.* 122:2–127:6; Silverman Letter [ECF No. 17-9]; *contra* Harris Dep. 101:13–18).  The observations included (1) Harris's suspicion that Mohamed was sleeping in the file room on January 10, 2007; (2) Harris's observation of Mohamed's consumption of coffee in the file room that same day; (3) Harris's observation of Mohamed eating a banana in the file room on January 11, 2007; and (4) Silverman's observation of Mohamed reading a newspaper in the emergency room on February 8, 2007.  (*See* Silverman Letter).  Silverman provided the list to McKeon.  (*See* Silverman Dep. 123:9–10).

On Friday, February 9, 2007, Mohamed was terminated by McKeon because, according to the termination letter, Mohamed had failed "to successfully complete [the] probationary period due

5

to [an] inability to meet the job performance standards." (McKeon Letter [ECF No. 17-10]; *see* Def.'s SMF ¶ 7; McKeon Decl. ¶ 4 [ECF No. 17-14]). At the meeting between McKeon and Mohamed, McKeon said, "'You are terminated because you did not satisfy the probationary period. . . . Please, Mohamed, do not take this as an act of revenge. It is not.'" (Mohamed Dep. 61:1–21). McKeon also shook Mohamed's hand, wished him luck and told Mohamed he could finish his shift. (*See id.* 61:22–62:8). When asked at deposition if this is all McKeon said during the fifteen minute meeting, Mohamed answered affirmatively. (*See id.* 62:6–8). In his Declaration, however, Mohamed states McKeon also assured him his termination was not caused by the newspaper incident. (*See* Mohamed Decl. ¶ 7). The day Mohamed was terminated was a Friday, and he signed out from work at 1:30 p.m., ninety minutes before his shift was scheduled to end. (*See* Timecard 2).

According to Silverman and McKeon, the grounds for Mohamed's termination were the four observations of Harris and Silverman. (*See* Silverman Dep. 123:14–20; McKeon Dep. 19:19–21:3). However, Mohamed believes the change in his job duties, work location, schedule, and termination "were all a result of [his] request to Sandy Sears . . . ." (Mohamed Decl. ¶ 10). Mohamed does not dispute he was in the emergency room on February 8, 2007, but claims he was there to pick up reports.[2] (*See* Pl.'s SDF ¶ 14). Mohamed denies sleeping at work and claims Harris startled him on the day she states he was sleeping in the file room. (*See* Pl.'s SDF ¶ 17; Mohamed Decl. ¶ 9). When Mohamed was observed eating and drinking, on January 10 and 11, 2007, file room employees

_____

[2] The Trust indicates the purpose of Mohamed's presence in the emergency room – to pick up reports as part of his job – is not supported by the record. (*See* Reply 2). While the record does indicate Mohamed was required to pick up films from the emergency room as part of his job responsibilities (*see* Harris Dep. 41:21–22; Silverman Dep. 23:10–12), there is nothing in the record to indicate Mohamed was picking up films on February 8, 2007, when Silverman observed him reading a newspaper. There is also nothing in the record to dispute Mohamed was reading a newspaper.

(including Harris) frequently consumed food and drinks in the file room and used it as a lunch room without repercussion.  (*See* Pl.'s SDF ¶ 17; Harris Dep. 108:25–109:18).  After January 12, 2007, the policy barring food and drink in the file room was enforced following an announcement to that effect by Silverman at a staff meeting.  (*See* Harris Dep. 109:19–21).  Silverman acknowledged, however, that no employee had ever been terminated for eating in the file room, and he could not recall any terminations due to an employee's failure to be in his or her assigned work area.  (*See* Silverman Dep. 134:10–12, 135:25–136:4).

Mohamed filed his Complaint against the Trust on May 7, 2009, alleging religious discrimination and retaliation under Title VII and the FCRA.  (*See* Compl. ¶¶ 26–34).  The Trust filed its Motion for Summary Judgment asserting Mohamed is unable to establish a prima facie case of religious discrimination and cannot show the reasons for his termination were pretextual.  (*See* Mot. ¶¶ 1–3).

## II.  LEGAL STANDARD

Summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c).  "[T]he Court must view all evidence and make all reasonable inferences in favor of the party opposing summary judgment." *Chapman v. AI Transport*, 229 F.3d 1012, 1023 (11th Cir. 2000) (en banc) (quoting *Hayes v. City of Miami*, 52 F.3d 918, 921 (11th Cir. 1995)).  "An issue of fact is material if it is a legal element of the claim under the applicable substantive law which could affect the outcome of a case." *Burgos v. Chertoff*, 274 F. App'x 839, 841 (11th Cir. 2008) (quoting *Allen v. Tyson Foods*,

121 F.3d 642, 646 (11th Cir. 1997) (internal quotation marks omitted). "A factual dispute is genuine 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Channa Imps., Inc. v. Hybur, Ltd.*, No. 07-21516-CIV, 2008 WL 2914977, *2 (S.D. Fla. July 25, 2008) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

## III.  ANALYSIS

The Court must "view all evidence and make all reasonable inferences in favor" of Mohamed.  *Chapman*, 229 F.3d at 1023.  The Trust asserts it is entitled to summary judgment because there are no genuine issues of material fact as to each of Mohamed's claims, and as a matter of law, Mohamed's claims are unsupported by the evidence.  (*See* Mot. ¶¶ 1–3).  In his Complaint, Mohamed alleges violations of Title VII and the FCRA on the basis of (1) the Trust's failure to provide him reasonable accommodation, (2) religious discrimination, and (3) retaliation.  (*See* Compl. ¶¶ 26–34).  The Eleventh Circuit has determined "'[t]he FCRA is modeled after Title VII, so that federal case law regarding Title VII is applicable to construe the Act.'"  *Albra v. Advan, Inc.*, 490 F.3d 826, 834 (11th Cir. 2007) (quoting *Byrd v. BT Foods, Inc.*, 948 So. 2d 921, 925 (Fla. 4th DCA 2007)).  Consequently, Mohamed's Title VII and FCRA claims are analyzed together.

## A.  Reasonable Accommodation

The Trust asserts there is no genuine issue of material fact as to Mohamed's religious accommodation claim, and because Mohamed cannot establish a prima facie case of discrimination under Title VII, his claim should be rejected as a matter of law.  (*See* Mot. ¶ 1).  "Title VII requires that an employer 'make reasonable accommodation for the religious observances of its employees, short of incurring an undue hardship.'"  *Lake v. B.F. Goodrich Co.*, 837 F.2d 449, 450 (11th Cir.

1988) (quoting *Trans World Airlines, Inc. v. Hardison*, 432 U.S. 63, 75 (1977)).  A plaintiff demonstrates a prima facie case of religious discrimination for failure to accommodate religious beliefs by showing "'(1) he had a bona fide religious belief that conflicted with an employment requirement; (2) he informed his employer of his belief; and (3) he was discharged for not complying with the conflicting employment requirement.'" *Richardson v. Dougherty Cnty., Ga.*, 185 F. App'x 785, 789 (11th Cir. 2006) (quoting *Beadle v. Hillsborough Cnty. Sheriff's Dep't*, 29 F.3d 589, 592 n.5 (11th Cir. 1994)).

It is undisputed Mohamed's bona fide religious beliefs conflicted with his employment requirements, and he informed his employer of his beliefs.  Working the last hour of his Friday shift conflicted with Mohamed's Muslim practice of attending mosque for Friday afternoon prayers. When hired in April 1997, Mohamed informed his Tenet employers of the conflict and was accommodated "about the time [he] started to work there."  (Mohamed Dep. 18:17–19:5).  While Harris supervised Mohamed at Tenet, she was made aware of this accommodation.  (*See id.* 18:17–20:11; Harris Dep. 57:7–8).  After securing his position under the hospital's new ownership and within two weeks of the Trust acquiring Jackson North, Mohamed asked Harris if his religious accommodation would remain in effect.  (*See* Mohamed Dep. 41:6–12).  Mohamed maintains Harris and Silverman each verbally refused twice to grant his request.  (*See id.* 41:22–25, 45:21–46:9). Mohamed then wrote a letter to Sears appealing Harris's decision and gave Sears the letter on January 29, 2007.  (*See* Letter to Sears 1).  The request was transferred to McKeon who discussed it with Silverman, and Silverman ultimately personally informed Mohamed his accommodation

Case No. 09-21235-CIV-ALTONAGA/Brown

request was granted on January 30, 2007.  (*See* Def.'s SMF ¶ 11; Mohamed Dep. 53:1–17; Mohamed

Decl. ¶ 4).

Consequently, the Trust asserts Mohamed cannot establish the third prong of his prima facie

case – that he was discharged for failing to comply with a conflicting employment requirement –

because no conflicting employment requirement existed at the time of his termination.  *See Ansonia*

*Bd. of Educ. v. Philbrook*, 279 U.S. 60, 68 (1986) (finding "where the employer has already

reasonably accommodated the employee's religious needs, the statutory inquiry is at an end.").  The

Trust points to the fact Mohamed's religious practices were accommodated; he was given permission

to leave work early on Fridays.  (*See* Reply 5).  In both his deposition and declaration, Mohamed

directly acknowledges his religious accommodation was granted on January 30, 2007.  (*See*

Mohamed Dep. 53:12–14; Mohamed Decl. ¶ 4).  In his deposition, Mohamed states Silverman called

him into his office on January 30, 2007, shook his hand, and said, "Good luck.  You do have

permission to go to the mosque."  (Mohamed Dep. 53:12–14).

Nevertheless, Mohamed maintains he can establish a prima facie case of failure to

accommodate because the evidence shows he did not leave early on Friday, February 2 and Friday,

February 9, 2007, and because the "actions taken by the Defendant after allegedly granting . . . the

accommodation . . . indicate that it had no intention of allowing Plaintiff to leave an hour early on

Fridays to attend religious services."  (*See* Resp. 8 [ECF No. 19]).  When asked if he left early to

attend services after he received permission, Mohamed answered affirmatively, and when asked how

many Fridays he left early to attend services after being granted permission, he recalled, "After the

permission – I think it was two Fridays, or one."  (Mohamed Dep. 56:18–57:1).  The timecard

10

Case No. 09-21235-CIV-ALTONAGA/Brown

indicates Mohamed left early on the day he was terminated , February 9, 2007, but not on February 2, 2007.  (*See* Timecard 1–2).

There is nothing in the record to indicate why Mohamed failed to leave early on February 2, 2007.  Mohamed does not testify he was directed not to leave early on Fridays after Silverman allowed him to do so.  He never states a belief the accommodation was a false promise, pretense or scheme by the Trust.  Mohamed does not even suggest he feared he would lose his job if he left early on February 2, 2007.  Nor does Mohamed testify he believed the actions of Harris following his meeting with Silverman were intended to dissuade him from leaving early on Fridays.

What Mohamed asks the Court to do is to speculate as to the reason he did not leave work early on Friday, February 2, 2007.  *See Williams v. United States*, 314 F. App'x 253, 259 (11th Cir. 2009) ("Unsupported speculation does not create a genuine issue of material fact.").  He also asks the Court to speculate that the actions of Harris in changing his duties and work schedule were designed to thwart his accommodation, but he does not explain how.  While Harris's actions may fit a retaliatory scheme, nothing in the record suggests the Trust did not intend to honor the accommodation.  If anything, the proposed schedule changes would have further accommodated Mohamed's religious duties by allowing him to have Fridays off.  (*See* Harris Dep. 97:3–18).

Once Mohamed was granted his accommodation on January 30, 2007, no employment practice conflicted with Mohamed's bona fide religious belief at the time of his discharge.  As a result, Mohamed cannot establish the third prong of his prima facie case – that his termination resulted from his failure or inability to comply with a conflicting employment requirement because no conflict with his duties has been shown.

11

Case No. 09-21235-CIV-ALTONAGA/Brown

**B. Religious Discrimination**

The Trust also maintains Mohamed's claim of religious discrimination must fail as a matter of law because Mohamed cannot establish his claim using either direct or indirect evidence. (*See* Def.'s Mem. 9–13 [ECF No. 18]). Mohamed alleges the Trust violated Title VII and the FCRA by discriminating against him "with respect to the terms and conditions of his employment because of his religion." (Compl. ¶¶ 27, 32). Title VII prohibits employers from discriminating with respect to an employee's "compensation, terms, conditions, or privileges of employment, because of such individual's . . . religion . . . ." 42 U.S.C. § 2000e-2(a)(1). "The ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *Texas Dep't. of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981). "Whether an employer intentionally discriminated against an employee . . . is a question of fact, which may be proved either through direct or circumstantial evidence." *E.E.O.C. v. Joe's Stone Crabs, Inc.*, 296 F.3d 1265, 1272 (11th Cir. 2002). Mohamed maintains he presents both direct and indirect evidence in support of his claim of religious discrimination. (*See* Resp. 12–14). The analytical approach and burden of production differs depending upon the type of evidence presented. *See E.E.O.C. v. Alton Packaging Corp.*, 901 F.2d 920, 923 (11th Cir. 1990). For this reason, the Court evaluates the facts under both frameworks.

**1. Direct Evidence**

The Trust asserts Mohamed cannot establish discrimination using direct evidence because (1) Harris's statements were unrelated to Mohamed's termination, (2) the statements are stray remarks, and (3) Harris was not the decision maker in Mohamed's termination. (*See* Def.'s Mem.

12

Case No. 09-21235-CIV-ALTONAGA/Brown

12; Reply 7). "Direct evidence of discrimination is evidence, that, 'if believed, proves the existence of a fact in issue without inference or presumption.'" *Schoenfeld v. Babbitt*, 168 F.3d 1257, 1266 (11th Cir. 1999) (quoting *Burrell v. Bd. of Trs. of Ga. Military Coll.*, 125 F.3d 1390, 1393 (11th Cir. 1997)) (internal brackets omitted). "'[O]nly the most blatant remarks, whose intent could mean nothing other than to discriminate on the basis of some impermissible factor' constitute direct evidence of discrimination." *Akouri v. Fla Dep't of Transp.*, 408 F.3d 1338, 1347 (11th Cir. 2005) (quoting *Rojas v. Florida*, 285 F.3d 1339, 1342 n.2 (11th Cir. 2002) (citation omitted)). "If the alleged statement suggests, but does not prove, a discriminatory motive, then it is considered circumstantial evidence." *Id.* (citing *Wilson v. B/E Aerospace, Inc.*, 376 F.3d 1079, 1086 (11th Cir. 2004)).

Additionally, direct evidence reflects a "'discriminatory or retaliatory attitude correlating to the discrimination or retaliation complained of by the employee.'" *Williamson v. Adventist Health System/Sunbelt, Inc.*, No. 09-12936, 2010 WL 1444574, at *3 (11th Cir. Apr. 13, 2010) (quoting *Damon v. Fleming Supermarkets of Fla., Inc.*, 196 F.3d 1354, 1358 (11th Cir. 1999)) (internal quotation marks omitted). "[R]emarks by non-decisionmakers or remarks unrelated to the decisionmaking process itself are not direct evidence of discrimination." *Standard v. A.B.E.L. Servs., Inc.*, 161 F.3d 1318, 1330 (11th Cir. 1998); *see also Afkhami v. Carnival Corp.*, 305 F. Supp. 2d 1308, 1320 (S.D. Fla. 2004). To meet this rigorous standard, the Eleventh Circuit has suggested as an example of direct evidence "a management memorandum saying, 'Fire Earley—he is too old.'" *Earley v. Champion Intern. Corp.*, 907 F.2d 1077, 1081 (11th Cir. 1990).

13

Case No. 09-21235-CIV-ALTONAGA/Brown

Mohamed points to Harris's statements and actions as direct evidence of discrimination.  In his deposition, Mohamed recalled Harris called him into her office after he had received approval to leave early on Fridays.  (*See* Mohamed Dep. 50:5–15).  When asked what happened at their meeting, Mohamed said:

> As soon as I entered in her office, she said, 'So you went over my head.'  . . . 'This is a Christian country.  If I give you time off to go to the mosque, I have to give everybody time off to go to church.  We don't kill people here.  Your religion is your problem.'

(*Id.* 50:17–25).  Mohamed also maintains Harris's actions in changing his duties and schedule are direct evidence of discrimination.  (*See* Resp. 13).

Viewing the facts in a light most favorable to Mohamed, Harris's statements and actions are not direct evidence of discrimination because they merely "suggest[], but do[] not prove" discrimination.  *Akouri*, 408 F.3d at 1347 (citing *Wilson*, 376 F.3d at 1086).  Harris's statement and actions are not the functional equivalent of "Fire Earley—he is too old."  *Earley*, 907 F.2d at 1081.  Rather, a reasonable juror would be required to draw an inference that because Harris holds a discriminatory animus towards Muslims, she changed Mohamed's schedule and assignment and was involved in his termination.  The statements and actions only suggest a discriminatory motive and therefore, are circumstantial by definition.  *See Burrell*, 125 F.3d at 1393–94.  Because the statements are not direct evidence, it is unnecessary to determine whether Harris's remarks are stray remarks or whether Harris was a decision maker.  Harris's statements can only be considered circumstantial evidence to support Mohamed's discrimination claim.

14

Case No. 09-21235-CIV-ALTONAGA/Brown

### 2. Indirect Evidence

The Trust also asserts Mohamed cannot establish discrimination by circumstantial or indirect evidence because (1) Mohamed cannot establish he suffered an adverse employment action (*see* Def.'s Mem. 10–11; Reply 6); (2) Mohamed failed to identify a similarly-situated probationary employee who was terminated (*see* Reply 7–8); and (3) Mohamed cannot show the reasons he was terminated were pretextual.  (*See* Def.'s Mem. 14–15; Reply 8–10).

A plaintiff may establish religious discrimination through indirect or circumstantial evidence using the burden-shifting analysis set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973).  The burden-shifting analysis of *McDonnell Douglas* requires a plaintiff to first establish a prima facie case of discrimination by demonstrating (1) he is a member of a protected class, (2) he was qualified for the position at issue, (3) he suffered an adverse employment action, and (4) a similarly-situated employee who is not a member of his protected class was treated more favorably. *See Dixon v. Palm Beach Cnty. Parks & Rec. Dep't*, 343 F. App'x 500, 501 (11th Cir. 2009).  If the plaintiff establishes a prima facie case of discrimination, the burden shifts to the defendant to produce legitimate, nondiscriminatory reasons for its actions against the plaintiff.  *See McDonnell Douglas*, 411 U.S. at 802.  If the defendant satisfies its requirement, the plaintiff then has the ultimate burden of persuading the trier of fact that the defendant's articulated reasons are unworthy of credibility.  *See id.*

There is no dispute Mohamed can establish the first two requirements of a prima facie case of religious discrimination under *McDonnell Douglas*; he is a member of a protected class and was qualified for the position at issue.  Mohamed is a Muslim, and sufficient facts in the record establish

15

Mohamed was qualified for his position. Harris acknowledges, for example, Mohamed was "a good employee" while at Tenet. (Harris Dep. 38:2–6). He was reclassified to the position of Clerk 2 when he began working for Jackson North. (*See id.* 62:23–18). These two facts are sufficient for a reasonable juror to conclude Mohamed was qualified for his position.

Turning to the third requirement for a prima facie case, to prove he suffered an adverse employment action Mohamed must show "a *serious and material change* in the terms, conditions, or privileges of employment" as "viewed by a reasonable person in the circumstances." *Davis v. Town of Lake Park, Fla.*, 245 F.3d 1232, 1239 (11th Cir. 2001). Examples of adverse employment actions include "'a *significant* change in employment status, such as hiring, firing, failing to promote, reassignment with *significantly* different responsibilities, or a decision causing a *significant* change in benefits.'" *Id.* at 1239 (quoting *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 761 (1998)). There is no dispute Mohamed was terminated; firing – "an ultimate employment action" – is an adverse employment action. *Wideman v. Wal-Mart Stores, Inc.*, 141 F.3d 1453, 1456 (11th Cir. 1998).

Mohamed also asserts the prospective change in his work schedule and his reassignment to the front file room with its significantly different responsibilities without sufficient training were adverse employment actions. (*See* Resp. 10–11). The Trust maintains these actions do not rise to the level of adverse employment actions under Title VII because the reassignment was of short duration (less than ten days), did not result in a loss of pay, and was simply a change of duty location. (*See* Def.'s Mem. 10–11). Moreover, the Trust asserts Mohamed's weekly work schedule did not change before he was fired. (*See id.*). There is no bright-line test to determine which employment

actions are actionable under Title VII, but "[i]t is clear . . . that not all conduct by an employer negatively affecting an employee constitutes adverse employment action." *Davis*, 245 F.3d at 1238 (citation omitted).  To be adverse, the employer's action must impact "the plaintiff's job in a real and demonstrable way," "cannot be speculative" and "does not require proof of direct economic circumstances."  *Id.* at 1239; *see also Austin v. City of Montgomery*, 196 F. App'x 747, 752 (11th Cir. 2006).  While changes in assignments or work-related duties do not ordinarily constitute adverse employment decisions, when an employee was reassigned to a position where he was expected to perform difficult or impossible tasks for him to complete, the employer's actions were found to be adverse.  *Davis*, 245 F.3d at 1244 (comparing *McNely v. Ocala Star-Banner Corp.*, 99 F.3d 1068, 1077-78 (11th Cir. 1996)).

Considering the facts in a light most favorable to the Plaintiff, the question here is whether Mohamed's reassignment and prospective change in work schedule resulted in serious and material changes to his terms of employment.  The change in work schedule is speculative as it never took place and cannot, therefore, be an adverse employment action.  However, Mohamed was on probation when he was reassigned to the front file room where he was required to operate a computer, answer phones and interact with doctors, duties for which he was either insufficiently trained or prepared and an assignment his immediate supervisor believed he could not perform.  (*See* Harris Dep. 104:17–106:7).  A reasonable person could view Mohamed's reassignment to be an adverse employment action under those circumstances.

The Trust also asserts Mohamed cannot establish a prima facie case because he has failed to identify any similarly-situated employee outside of his class – a non-Muslim – who was treated more

favorably (not fired for reading a newspaper in the emergency room) by the Trust. (*See* Def.'s Mem. 14). Mohamed suggests "it is not necessary . . . to establish the existence of a comparator to meet his burden," but cites no authority for the proposition. (*See* Resp. 11). Instead, Mohamed points to the testimony of Silverman and Harris that other employees who ate and drank in the file room were not fired and Silverman's testimony indicating he could not recall any employee being disciplined or terminated for failing to be in his or her work area. (*See* Resp. 11–12; Harris Dep. 108:14–109:5 Silverman Dep. 134:10–136:10).

"To make a comparison of the plaintiff's treatment to that of non-minority employees, the plaintiff must show that he and the employees are similarly situated in all relevant respects." *Holifield v. Reno*, 115 F.3d 1555, 1562 (11th Cir. 1997) (citations omitted). Generally, courts look to the "'nature of the offenses committed and the nature of the punishment imposed'" to establish comparability. *Silvera v. Orange Co. Sch. Bd.*, 244 F.3d 1253, 1259 (11th Cir. 2001) (quoting *Jones v. Bessemer Carraway Med. Ctr.*, 137 F.3d 1306, 1311 (11th Cir. 1998)). "In order to satisfy the similar offense prong, the comparator's misconduct must be nearly identical to the plaintiff's in order 'to prevent courts from second-guessing employers' reasonable decisions and confusing apples with oranges.'" *Id.* at 1259 (quoting *Maniccia v. Brown*, 171 F.3d 1364, 1368 (11th Cir. 1999)).

The Trust asserts Mohamed has not produced a similarly-situated employee, specifically, a non-Muslim co-worker who was not terminated for reading a newspaper in the emergency room. (*See* Def.'s Mem. 14). Mohamed maintains he has established the existence of employees who were treated more favorably in similar situations. (*See* Resp. 11–12). Mohamed generally shows other employees consumed food and drink in the file room and were not fired, but the comparators are so

Case No. 09-21235-CIV-ALTONAGA/Brown

general that he fails to establish whether those other employees were non-Muslim. Mohamed also characterizes a comparable employee as one who was retained when the individual committed a single act of misconduct. (*See* Resp. 11). Such a characterization is incorrect as the appropriate comparator is an employee who engaged in not one, but several violations similar to those cited by the Trust as grounds for Mohamed's dismissal. *See Maniccia*, 171 F.3d at 1369 (distinguishing comparators on basis of both quantity and quality of misconduct). Even if Mohamed is able to establish the first three observations were pretext for his termination, Mohamed has not identified any non-Muslim comparator who was found reading a newspaper on the job who was not terminated. Because he has not identified a valid comparator, Mohamed has failed to establish a prima facie case of religious discrimination.

In sum, the Trust has established Mohamed cannot show a prima facie case of religious discrimination as a matter of law because his claim is not supported with direct evidence, nor can he show via indirect evidence that other similarly-situated non-Muslims were treated more favorably by the Trust.

**C. Retaliation**

Mohamed alleges the Trust retaliated against him because he requested a reasonable accommodation to practice his religion. (*See* Compl. ¶¶ 28, 33).[3] "Retaliation is a separate offense under Title VII." *Meeks v. Computer Assocs. Int'l*, 15 F.3d 1013, 1021 (11th Cir. 1994). Employers are prohibited from discriminating against employees who oppose the unlawful employment

_____

[3] While the Complaint's organization makes it difficult to identify Mohamed's claims as "Counts," it is clear Mohamed pleaded both religious discrimination and retaliation under Title VII and the FLSA. (*See* Compl. ¶¶ 27, 28, 32, 33).

practices set out in Title VII or make charges of discrimination under the statute. *See* 42 U.S.C. § 2000e-3(a). "The employee need not prove the underlying claim of discrimination which led to her protest" in a retaliation claim. *Tipton v. Canadian Imperial Bank of Commerce*, 872 F.2d 1491, 1494 (11th Cir. 1989). Instead, the issue is whether the employee was discriminated against by the employer because of the employee's reliance on Title VII's remedial measures.

The Trust fails to address Mohamed's retaliation claim in its Motion for Summary Judgment and accompanying Memorandum of Law ("Memorandum"). The word "retaliation" appears nowhere in the Motion. Retaliation is not addressed in a Motion organized under the following three substantive points: (1) "Plaintiff is unable to establish a prima facie case of *religious discrimination* under Title VII;" (2) "Plaintiff is unable to establish a prima facie case of *religious discrimination* because he cannot identify" a comparator; and (3) the Trust "is entitled to summary judgment because Plaintiff cannot show that the proferred [sic] reasons for his termination were pretextual." (Mot. ¶¶ 1–3) (italics in original omitted; emphasis added). It appears the Trust has not properly moved for summary judgment on Mohamed's retaliation claim.

A close reading of the Trust's Memorandum leads the Court to a similar conclusion. Nowhere in the Memorandum does the Trust present or address the elements of a retaliation claim. The Memorandum is structured as follows: "A. Plaintiff cannot establish a prima facie case of *religious discrimination*;" "B. The Plaintiff cannot establish a prima facie case of *religious discrimination* as to his termination;" and "C. The Trust's Motion . . . must be granted because . . . McKeon terminated Mohamed . . . for legitimate reasons unrelated to his request for religious accommodation." (Def.'s Mem. 9, 12, 14) (emphasis added). The title of section C suggests an

Case No. 09-21235-CIV-ALTONAGA/Brown

analysis of retaliation will follow.  But the Trust continues to address Mohamed's disparate treatment claim for religious discrimination – and not retaliation – by pointing to the lack of comparators and discussing whether Mohamed can show the reasons for his termination to be pretextual.[4]  (*See id.* 16).  A prima facie case of retaliation does not require a showing of "similarly-situated" comparators. *See, e.g.*, *McCray v. Wal-Mart Stores, Inc.*, No. 09-11939, 2010 WL 1784247, at *1 (11th Cir. 2010) (the elements of a retaliation claim are (1) a showing the plaintiff engaged in statutorily protected activity; (2) plaintiff suffered a materially adverse action of a type that would dissuade a reasonable employee from engaging in statutorily protected activity; and (3) there is a causal relation between the events).

While the final two paragraphs of the Trust's Memorandum address the third element of a retaliation claim (whether there is a causal relation between the events), nowhere in its Memorandum does the Trust discuss the first two elements of retaliation.  This is especially critical because what constitutes an adverse employment action under a claim of retaliation is different from an adverse employment action under a claim of discrimination.  *See Crawford v. Carroll*, 529 F.3d. 961, 973 (11th Cir. 2008) (discussing the "decidedly more relaxed" and "broadened" standard for retaliation under *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53 (2006)).

Because the Trust does not address Mohamed's retaliation claim, this claim remains the single issue preserved for trial.

---

[4] The Court observes Mohamed discusses retaliation in the third section of his Response (*see* Resp. 16), but the Response does not parallel the Trust's Motion or Memorandum and is structured according to Mohamed's claims (failure to accommodate, religious discrimination and retaliation).  (*See* Resp. 5, 9, 16).

Case No. 09-21235-CIV-ALTONAGA/Brown

## IV.  CONCLUSION

Consistent with the foregoing analysis, it is hereby

**ORDERED AND ADJUDGED** as follows:

1.      The Defendant, Public Health Trust's Motion for Summary Judgment is **GRANTED** as to Plaintiff, Yassim Mohamed's claims for religious accommodation and religious discrimination under Title VII and the FCRA.

2.      Plaintiff, Yassim Mohamed's claim of retaliation under Title VII and the FCRA remains for trial.  Calendar call is scheduled for July 27, 2010.

**DONE AND ORDERED** in Chambers at Miami, Florida, this 19th day of July, 2010.

*Cecilia M. Altonaga*

**CECILIA M. ALTONAGA**
**UNITED STATES DISTRICT JUDGE**

cc: counsel of record

22